UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

K.K.,

          Plaintiff,

   v.

KILOLO KIJAKAZI,

          Defendant.

Case No.  21-cv-00489-JCS

**ORDER GRANTING PLAINTIFF'S SUMMARY JUDGMENT MOTION, DENYING DEFENDANT'S SUMMARY JUDGMENT MOTION AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 15, 17

## I.    INTRODUCTION

On October 10, 2018, K.K.[1] applied for disability under Title II of the Social Security Act alleging disability beginning April 17, 2016.   The claim was denied initially and upon reconsideration, and Ruxana Meyer, an administrative law judge ("ALJ"), held a hearing on April 14, 2020 via telephone.  On September 10, 2020, the ALJ denied Plaintiff's application and on December 10, 2020, the Appeals Council denied Plaintiff's appeal of the ALJ's decision, making it the final decision of Defendant Commissioner of the Social Security Administration ("Commissioner").  After the Appeals Council denied review, Plaintiff sought review in this Court pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and remands for further proceedings.[2]

---

[1] Because opinions by the Court are more widely available than other filings and this Order contains potentially sensitive medical information, the Court refers to Plaintiff using only his initials.

[2] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28

## II.     REGULATORY FRAMEWORK FOR DETERMINING DISABILITY

### A.     The Five-Step Framework

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ

U.S.C. § 636(c).

United States District Court
Northern District of California

1    determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

2         At step three, the ALJ compares the medical severity of the claimant's impairments to a

3    list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20

4    C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination

5    of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is

6    disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

7         At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and

8    past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still

9    do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's]

10   case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's

11   RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).

12   Past relevant work is "work that [a claimant] has done within the past fifteen years, that was

13   substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."

14   20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the

15   ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work,

16   then the ALJ proceeds to step five.

17        At step five, the Commissioner has the burden to "identify specific jobs existing in

18   substantial numbers in the national economy that the claimant can perform despite [the claimant's]

19   identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v.*

20   *Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the

21   claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and

22   entitled to benefits if there are not a significant number of jobs available in the national economy

23   that the claimant can perform.  *Id.*

24

25

26

27

28

B.   **Factual Background**[3]

1.   **Education and Work History**

K.K. completed high school and one year of college.  Administrative Record ("AR") 181. He was 57 years old at his alleged onset date. AR 153. K.K. worked as a car dealer from 1990 to April 2013. AR 186.  He worked as a car salesman from February 2014 until June 30, 2016, when he stopped working due to his alleged chronic degenerative joint disease. AR 180-181, 186.  K.K. returned to work as a car salesman at a Toyota dealership in December 2018, when he earned $858, and he continued to work there in January 2019, earning $2,959.22.  AR 174.  He did not work between February and October 2019 but returned to work at the Toyota dealership in November 2019 and continued to work there until mid-March 2020, when he stopped working due to the COVID-19 emergency.  AR 174, 247.   His monthly earnings for the months between November 2019 and March 2020 were: $812.16 (November); $3,491.56 (December); $5,822.28 (January); $5,482.69 (February); $5,705.39 (March).  AR 174.  K.K. returned to work at the Toyota dealer on June 1, 2020.  AR 247.

On June 11, 2020, Dayle Kettler, an employee in the payroll office[4] of the Toyota dealership where K.K. worked at various times between 2018 and 2020 completed a Work Activity Questionnaire for the period January 2020 through March 2020.  AR 240-242.  The form states that during this period K.K. worked as a salesperson; that he was not "frequently absent from work" and did not "work under special conditions such as with extra help/supervision, fewer/easier duties, frequent rest periods, or lower production" and that his work was "satisfactory when compared to another employee who worked in a similar position" but that he was only 80% as productive as other employees.  AR 241.  On this form, "yes" was checked in response to the following questions: "1. Does the employee complete all the usual duties required for his/her

---

[3] Although the Court ordered the parties to meet and confer and submit a joint statement of the record – or if they could not agree, separate statements of the record – the Commissioner did not respond to the attempts by Plaintiff's counsel to meet and confer and did not file a separate statement of the administrative record.  The Court considers the Commissioner's failure to comply with the Court's Order to be an admission that Plaintiff's statement of the record is accurate.

[4] K.K. sent an email to the Social Security Administration dated July 7, 2020 stating that this bookkeeper worked at a separate location from the "secluded" Toyota car lot where K.K. worked and had never come to that location or observed him while he worked. AR 249.

United States District Court
Northern District of California

position?" "2. Is the employee able to complete all the job duties without special assistance?" "3. Does the employee regularly report for work as scheduled?" "4.  On average, does the employee complete his/her work in the same amount of time as employees in similar positions?"  AR 240. None of the boxes listing various types of special on-the-job assistance (e.g., "[f]ewer or easier duties"; "[m]ore breaks/rest periods"; "less hours") was checked. AR 240.

The record also contains another Work Activity Questionnaire completed by Sales Manager Don Crawford, K.K.'s supervisor, for K.K.'s work starting November 2019.  AR 251-251.[5] Crawford checked the same boxes as Kettler and also left blank the question listing different types of on-the-job assistance offered the employee.  *Id.*  However, in response to the question "[d]oes the employee regularly report for work as scheduled" Crawford wrote in, "with some tardiness."  AR 250.  In addition, although Crawford answered "no" to the question asking if the employee "work[ed] under special conditions" he also included the notation "Takes Breaks."  AR 251.

### 2.  Medical Treatment

K.K.'s primary care physician, Andrew Wong, M.D., has been seeing K.K. every three months since February 2007.  AR261.   Dr. Wong provided a musculoskeletal evaluation in November 2018. AR 261-63. Dr. Wong noted a diagnosis of degenerative joint disease beginning in February 2007 and listed K.K.'s symptoms as "pain."  AR 261. Dr. Wong noted that Plaintiff exhibited 30 degrees of flexion and extension in both shoulders AR 261. Dr. Wong indicated that Plaintiff's shoulders exhibited tenderness but no swelling, warmth, redness, or atrophy. AR 261. Dr. Wong opined that Plaintiff had no disorganization of motor function and no limitations in reaching, handling, or fingering. AR 262. Dr. Wong noted no impairments affecting the lower extremities. AR 262. He left blank the question asking if K.K. used an assistive device for standing or walking.  A.R. 262.

In a letter dated May 2019, Dr. Wong stated that Plaintiff had hypertension, atrial fibrillation, and chronic degenerative joint disease. AR 349. Dr. Wong noted that Plaintiff often

---

[5] Although this Work Questionnaire is in the AR, there is no entry for it in the Table of Contents and the form itself was not dated.

experienced right hip joint pain and further opined that it was "not advisable for him to engage in work that requires long periods of standing."  AR 349.  In September 2019, Dr. Wong wrote a letter stating that K.K. should not travel due to his "chronic degenerative joint disease, atherosclerosis and atrial fibrillation." AR 479.

The record also contains treatment notes from Dr. Wong from February 2015 through February 2020.  Notes from a treatment visit in March 2016 include mention of elevated blood pressure. AR 288. Treatment notes from June 2017 also show elevated blood pressure. AR 275. A lab report from September 2017 showed elevated hemoglobin A1c levels to 6.5 percent of total hemoglobin, indicating that Plaintiff might have had diabetes. AR 276.  In February 2018, Plaintiff complained of right wrist and shoulder pain after falling while riding a bike. AR 272.  Dr. Wong ordered X-rays of Plaintiff's right shoulder in February 2018, which showed no abnormal findings and minimal narrowing of the acromioclavicular (AC) joint. AR 270.  At the same time, Dr. Wong ordered x-rays of Plaintiff's right wrist, which revealed no abnormal findings. AR 271.

K.K. wrote on a questionnaire for a November 2018 "well-male" visit that he suffered from "very bad pain in hip and nees [sic] and shoulders."  AR 268; *see also* AR 265 (notation of "shoulder pain" from November 26, 2018 visit); 274 (notation of "joint pain" from June 22, 2017 visit); 472 (notation of "leg pain" from September 16, 2019 visit); 475 (notation of "hip pain" and "shoulder pain" from May 24, 2019 visit).

Dr. Wong's treatment notes indicate that K.K. was on the following medications in 2018: Amlodipine 5 mg., aspirin 81 mg., ibuprofen 400 mg., and metoprolol 50 mg. AR 265 (11/26/18); 271 (2/22/2018, also noting Naprosen was prescribed but that K.K. was not taking it because it did not work); 273 (2/9/18).  Dr. Wong's treatment notes for the years 2015-2017 do not list any medications.

On May 24, 2019, Plaintiff received emergency treatment due to atrial fibrillation (irregular heartbeat) with rapid ventricular response, which was discovered during a routine medical appointment. AR 311.   K.K. reported that he had no palpitations, lightheadedness, dizziness, chest pain, or shortness of breath and felt like he could "run a marathon without any problem." AR 311. Plaintiff's treating physician noted "asymptomatic presentation" of his atrial

United States District Court
Northern District of California

fibrillation. AR 310. A chest x-ray showed mild cardiomegaly (enlarged heart) and multiple old healed left-sided rib fractures but no focal opacities (signs of lung infection or tumors) and no pneumothorax (collapsed lung). AR 298. A transthoracic echocardiogram showed normal left ventricular size with mildly depressed systolic function and left ventricular ejection fraction of 45-50 percent, hypokinetic inferior and posterior walls, normal right ventricular size and systolic function, no hemodynamically significant valvular disease (blocking of blood flow), and normal right atrial pressures. AR 342-43. The admissions paperwork from the Emergency Department indicated that K.K. was currently taking Amlodipine and aspirin (as reflected in the "still taking" column with the word "YES"), that he was prescribed Norco (hydrocodone) and Ibuprofen "as needed" on January 7, 2015 by physician's assistant Daniel Preston Harris, and that he had been prescribed metoprolol by a "historical provider, MD." AR 299.  In the discharge instructions from the Emergency Department, K.K. was instructed to "STOP taking" Norco and Ibuprofen and to continue to take aspirin.  AR 321.  A May 30, 2019 treatment note from Dr. Wong notes that K.K. was discontinuing Norco, ibuprofen and Amlodipine and that he was taking Lipitor 40 mg., nicotine, 2 mg., and Lisinopril, 20 mg.  AR 474.

In June 2019, K.K. visited cardiologist John Hau Lien, M.D., for a cardiac evaluation of his persistent atrial fibrillation.  AR 402. Dr. Lien prescribed a beta-blocker and a blood thinner to treat paroxysmal atrial fibrillation.  AR 405. A nuclear cardiology report in July 2019 showed a small area of mild ischemia within the proximal lateral wall with normal left ventricular volumes. AR 489.

In August 2019, Plaintiff underwent coronary artery bypass graft surgery due to severe triple-vessel coronary artery disease. AR 394.  In his post-surgery notes, Dr. Lien included obesity and "Type 2 diabetes mellitus with other specified complications" in his list of K.K.'s "problem[s]." AR 353. Upon discharge, K.K. was prescribed Eliquis 5 mg p.o. twice daily; Amiodarone 200 mg p.o. twice daily; Lopressor 100 mg p.o. twice daily;  Aspirin 81 mg p.o. daily;  Norco 5/325 mg 1 tablet p.o. q.12 hours p.r.n. severe pain, quantity 20 with no refills; Colace 100 mg p.o. twice a day p.r.n. constipation;  Famotidine 20 mg p.o.q. 12 hours p.r.n. acid reflux;  Hyzaar 100/12.S tablets 1 tablet p.o. daily; and Lipitor 80 mg p.o. daily.  AR 395.

1   A treatment note from Dr. Wong dated September 2019, indicates K.K. was taking

2   metoprolol, 50 mg., Lipitor, 80 mg., Eliquis, 50 mg., Aspirin 81 mg., amiodarone 200 mg. and

3   losartan/HCT (Hyzaar). AR  473 (9/16/19). Dr. Wong's treatment notes from November 5, 2019

4   listed the same medications. AR 492.

5   K.K. was seen by Dr. Lien for follow-up appointments in connection with his coronary

6   bypass surgery on September 6, 2019 and October 17, 2019.  AR 483.  At those appointment,

7   K.K. denied, *inter alia*, "dizziness", "chest pain with exertion", "fluid accumulation in the legs",

8   shortness of breath" and "weakness." AR 484, 487.

9   In October 2019, Dr. Lien stated in a letter that Plaintiff had severe coronary artery

10   disease ("CAD") with acute coronary syndrome. AR 477.  Dr. Lien stated that "[b]ecause of his

11   severe CAD and ischemia, [K.K.] [was] unable to stand on his feet for work at this time."  *Id.*

### 3.   Consultative Examination (Dr. Omar Bayne)

13   Orthopedist Omar Bayne, M.D., performed an orthopedic consultative examination of

14   Plaintiff in March 2019. AR 291-92.  In the section of the report entitled "History of Present

15   Illness," Dr. Bayne wrote:

> This 60-year-old right-handed claimant presents with a history of
> right hip and groin pain starting over two years ago. Squatting,
> stooping and stair climbing aggravate his hip and groin pain. X-rays
> of his right hip showed evidence of degenerative arthritis of his right
> hip. The claimant also complains of pain in both shoulders, left worse
> than the right. He has pain when he lies on his either shoulder. He has
> pain when he reaches and works with the right and left hand above
> the shoulder level. He has been treated conservatively for his hip and
> shoulder pain with pain medications and anti-inflammatory agents
> and physical therapy. He had ruptured spleen after falling down a
> ladder, for which he has been treated conservatively.

22   AR 291. Dr. Bayne listed K.K.'s medications as ibuprofen, metoprolol, amlodipine and aspirin.

23   AR 291.  Dr. Bayne observed Plaintiff ambulated with a slow antalgic gait but used no walking

24   aids. AR 291. Dr. Bayne noted Plaintiff was able to squat 75 percent of normal and was able to sit

25   and get up from a sitting to standing position with loss of his normal spinal rhythm because of

26   pain in his right hip. AR 291. Dr. Bayne observed Plaintiff had limited movement in both

27   shoulders but he had full strength in all muscle groups in the upper extremities except for the

28   shoulder girdle muscles (AR 291). Plaintiff exhibited normal sensation in the upper extremities,

United States District Court
Northern District of California

normal grip and pinch strength, and normal reflexes in the upper extremities. AR 292. Plaintiff showed some limitation of range of motion in the right hip but had full muscle strength in all muscle groups in the lower extremities. AR 292.

Dr. Bayne diagnosed K.K. with "[c]hronic progressive right hip pain/strain"; "[d]egenerative arthritis of the right hip progressive requiring total hip replacement arthroplasty in the future"; and "[b]ilateral rotator cuff tendonitis with impingement, left worse than right." AR 292. He described K.K.'s functionality as follows:

> Based on this claimant's orthopedic examination today, it is my opinion that he has no gross visual, hearing or speech impairment. He should be able to converse, communicate, understand, read and write in English. He should be able to drive or take public transportation. He should be able to stand and walk with appropriate breaks and with the use of a cane for support for four hours during an eight-hour workday. He should be able to sit with appropriate breaks for six hours during an eight-hour workday. Reaching and working with the hands above the shoulder level should be limited to occasionally. He should be able to lift and carry 10 pounds frequently and 20 pounds occasionally.

AR 292.

### 4.  Hearing

K.K. was represented by counsel at the hearing before the ALJ, conducted on April 14, 2020. In a pre-hearing brief, K.K.'s attorney pointed to Dr. Bayne's reference to x-rays showing degenerative arthritis in K.K.'s right hip, noting that it was "unclear whether or not DDS authorized a right hip x-ray that was reviewed by Dr. Bayne" and that there was "no radiology study of the right hip in the record." AR 238. Counsel also stated in the brief that Dr. Wong would "not authorize an x-ray or MRI until surgery [was] imminent" and that K.K. "requests a right hip x-ray." AR 238. At the hearing, K.K.'s counsel was asked by the ALJ whether she had reviewed the record and if it was complete; counsel responded that she had and it was. AR 36. Counsel further stated that there were no objections to any of the exhibits. AR 36.

At the hearing, K.K. testified that he began having difficulties with his right hip and his knees after falling off a ladder about ten years before. AR 52. According to K.K., he begins to experience pain in his hip when he stands for more than 10 to 20 minutes. AR 52. He testified that Dr. Wong had had two or three x-rays taken of his hip "all through the years" and told him he

1    would need a total hip replacement at some point but there was no discussion of the fact that the

2    record did not contain any hip x-rays and K.K.'s counsel represented to the ALJ that the record

3    was complete.  AR  36, 52.  K.K. testified that he used a cane when he went shopping and was

4    around the house but did not use a cane when he worked at the Toyota dealer in 2019 and 2020,

5    instead "sit[ting] down all the time" while he was at work.  AR 53. According to K.K., at work he

6    could sit down whenever he wanted.  AR 49.

7         K.K also testified that he experiences constant atrial fibrillation during the course of the

8    day and that his heart races sometimes, which sometimes causes him to become dizzy and need to

9    sit down for ten to twenty minutes to keep his heart rate down.  AR 50-52.  He testified that he had

10   become dizzy three times since his heart surgery the year before.  AR 51.

11        At the hearing, the ALJ discussed with counsel the significance of K.K.'s 2020 earnings

12   and whether they constituted substantial gainful activity for that year.  AR 54-56, 62.   She also

13   took testimony from vocational expert ("VE") Timothy Ferrell. The VE categorized Plaintiff's

14   past work as an automobile salesperson and a composite job of an automobile salesperson in

15   conjunction with automobile mechanic.  AR 42. The ALJ asked the VE about the availability of

16   work for a hypothetical person of Plaintiff's age, education, and work experience with the

17   following residual functional capacity (RFC): the hypothetical person could lift 20 pounds

18   occasionally, lift and carry 10 pounds frequently; stand and walk six out of eight hours; sit six out

19   of eight hours; perform no more than frequent climbing of ramps and stairs; perform no more than

20   occasional balancing, stooping, kneeling, crouching, and crawling; perform no more than frequent

21   bilateral pushing and pulling with the bilateral upper extremities; and could do work that did not

22   involve ladders, ropes, or scaffolding, overhead reaching, or work with extreme cold, vibration,

23   and hazards such as work at unprotected heights or near dangerous moving machinery. AR 56-57.

24   The VE testified that the hypothetical person could perform work as an automobile salesperson

25   AR 56-57.

26        The ALJ held the record open for two weeks to allow K.K. to submit further evidence

27   related to K.K.'s earnings, which counsel submitted after the hearing, along with further briefing.

28   AR 15, 60.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**C.    The ALJ's Decision**

At step one, the ALJ concluded that "the work performed by [K.K.] after his alleged onset date did not rise to the level of sustained substantial gainful activity for any continuous 6-month period."   AR 17.  She noted that K.K. engaged in substantial gainful activity ("SGA") in the first and fourth quarters of 2019 and the first three months of 2020 but that he did not engage in any SGA in 2018. AR 17-19. With respect to K.K.'s work in 2020, the ALJ found that K.K. was not being paid a subsidy (that is, more than his coworkers for the same duties) during this period for the purposes of evaluating SGA and that this work was not an "unsuccessful work attempt" as he stopped working in March due to the COVID 19 pandemic and not his impairments. AR 18.  In reaching these conclusions, the ALJ relied, in part, on the two Work Activity Forms discussed above, stating that K.K. was 80% as productive as his coworkers at the Toyota dealer. AR 18.  The ALJ acknowledged that the Work Activity Form completed by K.K.'s supervisor included notations that K.K. sometimes arrived late and took breaks but observing that it was unclear how often this occurred and that both forms stated that K.K. was 80% as productive as his coworkers. AR 18.  The ALJ continued to step two "given that there is no monthly SGA for the year 2018." AR 19.

At step two, the ALJ found that K.K. had the following severe impairments: "diabetes mellitus with obesity (5'7" and weighing 206 lbs. with a BMI of '32.6' in 2019" and "atherosclerosis and atrial fibrillation status-post August 2019 CABG/triple bypass  . . . with low LVEF of '40'. " AR 19.  The ALJ concluded that "all other reported conditions in the record [were] 'non-severe' impairments for purposes of this decision (20 CFR 404.1520 & 404.1521)" and that there was "no medical foundation to support the claimant's alleged onset date of April 17, 2016, based on claimant's citation to medical evidence from more than a decade before the alleged onset date (which preceded years of successful fulltime work) and then 3 years after the alleged onset date." AR 19.

The ALJ did not find K.K.'s degenerative joint disease in connection with his left shoulder and right hip to constitute a severe impairment, addressing the opinions of K.K.'s treating physician (Dr. Wong) and the consultative examiner (Dr. Bayne) as follows:

1
2
3
4
5

[T]he undersigned has fully considered all assessments by treating physician Dr. Wong of degenerative joint disease, as well as mention by one-time examining consultative orthopedist Dr. Bayne on March 21, 2019, of "degenerative arthritis of the right hip requiring right total hip replacement arthroplasty in the future," which was reportedly 'shown' by X-Rays (Ex. 4F). However, there are no such X-Rays in the record, nor referrals to hip or left shoulder imaging. While claimant reported to Dr. Bayne that "he has not been able to work since May of 2015" (Ex. 3F), earnings records show that the claimant grossed almost $14,000 in 2016, then $858 in 2018, and $7,000 in 2019, etc. (Ex. 9D).

6
7
8
9
10
11
12

The lack of hip imaging is consistent with physical examinations throughout the record in which the claimant continued to report grossly normal musculoskeletal and neurological findings including "normal" sensation, motor, reflex, straight leg-raising signs, and no atrophy, no fracture, no ankylosis, no subluxation, and no joint deformities (Ex. 2F, p. 5). The record does not support end-stage degenerative joint arthritis of the right hip given the lack of imaging, lack of cane or walker use, and lack of prescription pain medication use. Due to the lack of significant pathology for the claimant's right hip, the citations by Dr. Bayne of severe findings necessitating total right hip replacement were disproportionately based on the claimant's reports rather than on objective medical signs and laboratory findings.

13      AR 20.

14          The ALJ acknowledged that Dr. Wong opined in his November 26, 2018 assessment that

15      K.K. had "degenerative joint disease" but noted that "the only positive finding appears to have

16      been 'tenderness' as otherwise, Dr. Wong indicated that the claimant maintained normal sensation,

17      motor, reflex, negative straight leg-raising signs, no atrophy, no disorganization of motor function,

18      no fracture, ankylosis, subluxations, or joint deformities, but 'normal' extremities . . ., and no

19      limitations in reaching, handling, or fingering."  AR 20.  Similarly, she pointed out that although

20      Dr. Bayne "observed the claimant to ambulate with a 'slow, antalgic gait,'  it was noted that

21      [K.K.] was not using any walking aide such as a cane, and also, that he was able to perform 75%

22      of a normal squat, unassisted. The claimant was further found to demonstrated grossly full ('5/5')

23      motor strength throughout, other than '4/5' within the shoulder girdle muscles. Sensation was

24      normal otherwise, including normal grip strength and equal reflexes." AR 20-21.

25          At step three, the ALJ found that K.K. did not have any impairment or combination of

26      impairments that met or equaled a Listing.  AR 21-22.

27          At step four, the ALJ found that K.K. had the following RFC:

28              [T]he claimant had the residual functional capacity (RFC) to perform

12

1
2
3
4
5

> "light" work consisting of the ability to lift 20 pounds occasionally, lift and carry 10 pounds frequently; stand and walk 6 out of 8 hours; sit 6 out of 8 hours; perform no more than frequent climbing of ramps and stairs; no more than occasional balancing, stooping, kneeling, crouching, and crawling, and no more than frequent bilateral pushing and pulling with the bilateral upper extremities. The claimant can do work that does not involve ladders, ropes, or scaffolding, no overhead reaching, or work with extreme cold, vibration, and hazards such as work at unprotected heights or near dangerous moving machinery.

6   AR 22. The ALJ offered the following explanation for rejecting Dr. Bayne's opinions regarding

7   K.K.'s limitations as to standing and walking and his need to use a cane:

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

> On March 21, 2019, consultative orthopedist Dr. Bayne observed the claimant to maintain normal grip strength and grossly full ('5/5') motor strength throughout other than in the shoulder girdle muscles. While he observed the claimant to walk with a "slow, antalgic gait," the claimant was not using a cane at that time, and the claimant was able to perform 75% of a normal squat unassisted (Ex. 3F). Therefore, the undersigned finds the "light" work assessments by the State Agency reviewing physicians, including the ability to stand and walk for 6 hours cumulatively in an 8-hour workday (Ex.'s 1A & 3A) to be consistent with and supported by the overall medical evidence as a whole. Thus, the State Agency reviewing physicians' opinions are more persuasive than those by one-time examining Dr. Bayne who appeared to disproportionately base his assessments on the claimant's reports such as the need for right total hip replacement than imaging studies or clinical findings. The claimant was not using a cane at the time of the examination nor did he request one from his physician near this period [which] is inconsistent with the assessment by Dr. Bayne that the claimant would need a cane as of March 21, 2019. In fact, this restriction is internally inconsistent with the examination findings made in this same examination by Dr. Bayne including that the claimant maintained full ('5/5') muscle strength in both lower extremities, had grossly intact sensation and equal reflexes, and was able to perform 75% of a normal squat, unassisted (Ex. 3F). Treatment notes post surgery do not document lower extremity issues, nor balance issues, nor a request for or prescription of an assistive device. (Exhibit 7F, 8F and 12F) Thus the residual functional capacity does not indicate medical need for a cane, nor any persuasive reason that the claimant could not engage in light work for 12 continuous months, even if more limited during a typical post-surgical recovery period. The State Agency reviewing physicians opinions are consistent with the overall medical evidence of record and thus persuasive. More restrictions are not supported by the overall medical evidence for any continuous 12-month period.

25   AR 23.

26       With respect to Dr. Wong's May 30, 2019 letter stating that it was "not advisable for

27   [K.K.] to engage in work that requires long periods of standing[,]" the ALJ found the word "long"

28   to be vague and the opinion unclear as to the onset date of the limitation or whether it was an

impairment that could be expected to last at least 12 months.  AR 24.  Similarly, she found Dr. Wong's September 2019 letter stating that K.K. should not travel to be vague as to the type of travel and lacking in specific functional limitations, supporting radiographs or information about onset date.  AR 24. She also found Dr. Lien's October 2019 letter stating K.K. was unable to stand on his feet for work failed to provide the onset date of that limitation or the length of the limitation.  AR 24.  Overall, the ALJ concluded that these "letters and forms" were not persuasive because they "do not correlate to the objective medical signs and laboratory findings to support the vague limitations opined therein."  AR 25.

In assessing K.K.'s credibility with respect to his symptoms, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported, for the reasons explained in this decision." AR 26.  The ALJ offered the following reasons for her conclusion:

- The alleged onset date of April 17, 2016, did "not correspond to the medical evidence in the record which [began] almost two years after this date."  AR 25.

- The claimant "primarily based his application for Social Security disability benefits filed on October 9, 2018, on "chronic degenerative joint disease" but "X-Rays in the record show only 'minimal' AC joint space narrowing in the right shoulder and a normal left wrist" and although K.K. asserted that his doctor told him he needed a total hip replacement, "the record lacks evidence of the end stage hip disease."  AR 25.

- "Although Dr. Bayne observed the claimant to ambulate with a slow and antalgic gait, the claimant was not using any assistive device such as a cane."  AR 25.

- "[T]he treatment notes of Dr. Wong do not include prescriptions for any pain medication other than aspirin—which the claimant would reasonably be taking owing to the cardiac impairment."

- "More limitations are not supported by the treatment course of appointments scheduled every three months—the frequency of treatment indicated by the claimant's treating physician Dr. Wong."  AR 26.

- K.K.'s testimony about intermittent racing heart, dizziness and need to sit down was undermined by the fact that he returned to work in December 2019 "and worked at sustained SGA levels through March 2020, stopping for reasons unrelated to his health . . . suggest[ing] fewer limitations than alleged." AR 26.

At step five, the ALJ concluded based on K.K.'s RFC and the testimony of the VE that K.K. could perform past relevant work as a car salesperson and therefore was not disabled.  AR 26.

## III.    ISSUES FOR REVIEW

1. Whether the ALJ erred by failing to adequately develop the record with respect to the hip x-ray referenced by the consultative examiner.

2. Whether the ALJ failed to give adequate reasons in support of her credibility finding.

## IV.    ANALYSIS

### A.    Standard of Review

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).   When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.      Whether the ALJ Erred in Failing to Develop the Record**

### 1.   Legal Standards

"The ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.' " *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (internal quotation and citation omitted)). "This duty extends to the represented as well as to the unrepresented claimant" and can be satisfied in a variety of ways, including "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id.* (citations omitted); *see, e.g., Salter v. Barnhart,* No. C-00-3743 MMC, 2003 WL 22114263, at *4 n. 7 (N.D. Cal. Sept. 8, 2003) (finding that ALJ had adequately developed the record by holding the record open 30 days after the hearing to allow the claimants to submit x-ray reports). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.' " *Tonapetyan v. Halter*, 242 F.3d at 1150 (9th Cir. 2001) (quoting *Smolen v. Chater*, 80 F.3d at 1288).  An ALJ's decision may be set aside based on failure to develop the record if the claimant can demonstrate resulting prejudice or unfairness. *Chou Yang v. Astrue*, No. 2:11-CV-0654 GGH, 2012 WL 2065040, at *3 (E.D. Cal. June 7, 2012) (citing *Vidal v. Harris*, 637 F.2d 710, 713 (9th Cir.1991)).

### 2.   Discussion

K.K. contends the ALJ erred because Dr. Bayne referenced hip x-rays that were not in the record and therefore, "it was incumbent upon the ALJ to ensure that any and all evidence gathered by or provided to the examiner, including the hip x-ray, was also made part of the record." Plaintiff's Motion for Summary Judgment at 3.[6] The Court concludes that the record was adequate

---

[6] In his Reply brief, K.K. argued, for the first time, that the ALJ also should have developed the record to clarify the ambiguities associated with the notations on the Work Activity Form supplied by K.K.'s supervisor and the doctor notes supplied by Drs. Wong and Lien that she found to be vague.  Reply at 2-3.  Because these arguments were not (but could have been) included in the Motion, the Court finds that they are waived.  *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) (noting that arguments raised for the first time in a reply brief are waived).

United States District Court
Northern District of California

1    to allow the ALJ to evaluate K.K.'s alleged hip impairment and was not ambiguous and therefore,

2    that the ALJ fulfilled her duty to develop the record.

3           This is not a case where the ALJ failed to seek – or provide the claimant an opportunity to

4    obtain – probative evidence that was known to exist relating to the claimant's alleged disability.

5    Instead, although K.K. testified that Dr. Wong had ordered two or three x-rays of his hip "all

6    through the years" (AR 36), his attorney conceded in the post-hearing brief that Dr. Wong had

7    more recently refused to order a hip x-ray (AR 238).  Further, at the hearing K.K.'s counsel

8    expressly represented to the ALJ that the record was complete (AR 36).  Under these

9    circumstances, the ALJ could reasonably conclude that there were no x-rays of K.K.'s hip during

10   the relevant time period to be obtained from his providers.  Nor does K.K. aver anywhere that a

11   hip x-ray was taken in connection with his evaluation by Dr. Bayne or dispute in his reply brief

12   that the bill for Dr. Bayne's services lists only an examination and does not reflect that an x-ray

13   was taken.  *See* AR 294.  Thus, a reasonable interpretation of Dr. Bayne's reference to hip x-rays in

14   his report, *see*  AR 291, is that he relied on K.K.'s statements about the history of his alleged

15   degenerative joint disease and did not review those x-rays himself.  The Court rejects K.K.'s

16   strained reading of Dr. Bayne's report in support of his assertion that the ALJ was required to

17   inquire further about the hip x-rays referenced in Dr. Bayne's report because of ambiguity in the

18   record.    The Court does not find the record to be ambiguous as to whether Dr. Bayne reviewed

19   hip x-rays not in the record in connection with his report.

20          The Court also concludes that the record was adequate to complete an appropriate review

21   of K.K.'s alleged impairment given that it included five years of medical records from the

22   physician who diagnosed K.K.'s degenerative joint disease and treated him for that condition, as

23   well as a musculoskeletal assessment of K.K. completed in 2018.  The fact that the evidence in

24   these records may  (or may not) be inadequate to establish that K.K.'s degenerative joint disease

25   was a severe impairment (e.g., because Dr. Wong did not order x-rays of K.K.'s hip between

26   February 2015 and February 2020 or prescribe pain medication) does not mean the record was

27   insufficient to permit an appropriate review by the ALJ.  The Court therefore rejects K.K.s

28   assertion that the ALJ did not adequately develop the record.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### C.    Whether the ALJ Erred with Respect to Credibility Finding

#### 1.  Legal Standards

"The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). In assessing credibility, the ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.' " *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Then, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d at 1281.  The ALJ may consider that the medical record lacks evidence to support certain symptom testimony but cannot reject a claimant's testimony for that reason alone. *Burch v. Barnhart*, 400 F.3d 676, 680–81 (9th Cir. 2005).  The ALJ may also consider the claimant's "reputation for lying, prior inconsistent statements concerning the symptoms . . . unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and . . . the claimant's daily activities." *Smolen v. Chater*, 80 F.3d at 1184;  *see also Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (holding that "an unexplained, or inadequately explained, failure to seek treatment may be the basis for an adverse credibility finding unless one of a number of good reasons for not doing so applies.").

Where the ALJ rejects a claimant's symptom testimony, the ALJ must offer reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (internal quotation marks omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), as amended (Apr. 9, 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988)).

### 2. Discussion

The Court finds the ALJ offered insufficient reasons for not fully crediting K.K.'s testimony regarding the persistence, severity and limiting effects of his impairments.

Although K.K. testified that he needs to sit down and rest on a frequent basis (every 10 to 20 minutes) because of the pain associated with his degenerative joint disease in his shoulder and hip and due to dizziness associated with his atrial fibrillation, the ALJ pointed to inconsistencies in K.K.'s medical records with these complaints. In particular, the ALJ cited the fact that Dr. Wong's records from 2015 to 2020 do not contain any evidence of "end-stage hip disease," notations about the need for hip replacement surgery or hip x-rays, that he saw K.K. only every three months, and he prescribed only aspirin and anti-inflammatory medication (ibuprofen) for pain. AR 25- 26.

There is no doubt that Dr. Wong's treatment notes do not reflect that K.K.'s degenerative joint disease had reached the point where hip replacement surgery was required. Indeed, counsel implicitly conceded that it was not, stating in her post-hearing brief that although Dr. Wong had recommended total hip replacement, he had refused to authorize a hip x-ray or MRI until surgery was "imminent." AR 237. Thus, the ALJ's conclusion that the record does not contain medical evidence of "*end-stage* hip disease" is supported by substantial evidence. Nonetheless, this is not a clear and convincing reasons for concluding that K.K.'s hip pain would not preclude him from standing for six hours in an eight-hour day without use of an assistive device or taking frequent breaks because the ALJ does not explain why she focused only on "end-stage" hip disease. Nor does she point to any medical evidence suggesting K.K.'s symptom testimony was not consistent with degenerative joint disease even if it had not progressed to the point where surgery was required.

Second, although conservative treatment may provide a clear and convincing reason to discredit a claimant's symptom testimony, the ALJ's reliance on the frequency of K.K.'s visits to Dr. Wong (every three months) is insufficient because she has not pointed to any medical evidence suggesting that K.K.'s condition required that he be seen more frequently than once every three months. Nor is it clear why Dr. Wong's prescription of aspirin and ibuprofen for pain undermine

United States District Court
Northern District of California

1  K.K.'s symptom testimony.  The prescribing of "strong (and potentially addictive) medications" is

2  not a "prerequisite[[ ] to finding a claimant's subjective symptom allegations credible." *Khanh*

3  *Giang v. Berryhill*, No. SA CV 18-910-PLA, 2019 WL 631898, at *11 (C.D. Cal. Feb. 14, 2019).

4  The Court also notes that there is some evidence in the record that K.K. was, in fact, prescribed

5  hydrocodone for pain and that he was ordered to discontinue it in connection with his coronary

6  artery disease.  *See*  AR 299, 321, 474.

7        To the extent the ALJ relied on the fact that K.K. did not use a cane during his consultative

8  evaluation with Dr. Bayne, the ALJ does not explain why this fact supports her conclusion that he

9  can stand and walk up to six hours without a cane or frequent breaks to sit and rest.  There is

10  nothing in Dr. Bayne's report that suggests that his examination was lengthy or that K.K. was not

11  permitted to sit when he wanted to take a break.

12        Finally, although the ALJ relied heavily on the fact that K.K. was able to return to work in

13  2019 and continued to work full-time at the Toyota dealership in 2020 with only a short break due

14  to the COVID-19 pandemic, she did not explain why this work supported the RFC where K.K.

15  testified he could sit whenever he wanted while working there and his supervisor also stated in the

16  Work Activity Form that K.K. takes breaks.  AR 53, 251.

17        In sum, the Court concludes that the ALJ erred in evaluating K.K.'s symptom testimony

18  and that the RFC is not supported by substantial evidence with respect to K.K.'s ability to stand

19  for up to six hours in a day without extra breaks or use of an assistive device

20        **D.    Remedy**

21        "A district court may affirm, modify, or reverse a decision by the Commissioner 'with or

22  without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42

23  U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original

24  administrative proceeding, a social security case should be remanded."  *Lewin v. Schweiker*, 654

25  F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits

26  under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for

27  rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no]

28  outstanding issues that must be resolved before a disability determination can be made" and

United States District Court
Northern District of California

"further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *Garrison v. Colvin*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and ambiguities." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

Here, the Court declines to award benefits under the credit-as-true rule. Even crediting K.K.'s testimony that he cannot stand for long periods of time, the record is insufficient to determine whether additional limitations in this respect would preclude all available work. Therefore, the Court finds that the appropriate remedy is to remand the case for further proceedings.

## V.    CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's Summary Judgment Motion, DENIES Defendant's Summary Judgment Motion and remands the case to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated:  July 6, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge